UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR 1:25-10201-MSM |
| | : | |
| BRENDAN JONATHAN MULLANE, | : | |
| Defendant. | : | |

**UNSEALED[1] ORDER DENYING MOTION TO MODIFY**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

On May 1, 2025, Defendant Brendan Jonathan Mullane was charged by criminal complaint with harassing and intimidating two victims (victim A and victim B) in violation of 18 U.S.C. § 2261A(2)(B), which provides in relevant part:

> Whoever . . . with the intent to . . . injure, harass, [or] intimidate. . . uses . . . any interactive computer service or electronic communication service or electronic communication system of interstate commerce . . . to engage in a <u>course of conduct</u> that . . . causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person . . . .

18 U.S.C. § 2261A(2)(B) (emphasis added). Following his arrest, the Court held a detention hearing at which the government argued for detention. The Court released Defendant on May 6, 2025, on bail conditions to address the danger and risk of nonappearance that included:

- The appointment of Defendant's father as a Court-appointed Custodian[2] with the duty, *inter alia,* to supervise Defendant and to notify the Court immediately if Defendant violates a condition of release (Condition 6);

---

[1] This Order contains references to confidential information, including mental health information, from the bail report and other sources. Accordingly, it issued originally under seal. The parties were directed to advise the Court in writing by no later than October 13, 2025, whether and to what extent (by issuance of a redacted version) this Order should remain sealed. Because no party asked for redactions, it is now issued unsealed.

[2] Based on the bail report, the Court has been aware of and relied on the Custodian's status as an experienced attorney who is actively admitted to practice law in this Court.

- A prohibition on all contact, direct or indirect with any person who is or may be a victim or witness in the investigation or prosecution (Condition 7(g));

- Home detention with GPS monitoring (Condition 7(q)(i)(2) & (ii))[3]; and

- A prohibition on access to the internet unless authorized by Pretrial Services and a total prohibition on the possession of any computer or other device capable of connecting to the internet, including any tablet, cell phone, television, or gaming console (Condition 7(s)).[4]

See ECF No. 15.  On May 27, 2025, Defendant was indicted for the same crime, albeit expanded *inter alia* by the addition of new victims (victims C and D).  ECF No. 24.  On August 7, 2025, the Court amended other conditions but did not change the four listed above.  ECF No. 48.

Now pending before the Court is Defendant's Motion to Modify Conditions.  ECF No. 42.  Defendant asks the Court to eliminate the condition imposing a ban on Defendant's internet access (unless authorized by Pretrial Services) and possessing or using internet connected devices (Condition 7(s)).  Id.  Relatedly, focusing on Condition 7(q) (imposing home detention), Defendant points out that he graduated from law school in 2019 and passed the bar examination in 2020[5]; he seeks to expand his ability to leave the home to go to Suffolk Law School to participate in his defense by performing legal research.  The government objects to any change in these conditions.

---

[3] This condition was modified by Text Order on June 4, 2025, to clarify that "Defendant may leave the home for up to two hours per day (with the time to be approved in advance by the supervising officer) for the purpose stated in the motion, with the geographic area of such outdoor exercise to be circumscribed based on the area described in the motion and more particularly based on limitations to be set by the supervising officer, whose limits shall be based on his discretion informed by what he deems sufficient to afford a reasonable opportunity for outdoor exercise as stated in the motion."

[4] On June 3, 2025, the Court modified this condition to clarify that Defendant can access the internet for the purpose of participating remotely in a court proceeding based on his consent and waiver of the right to appear.  Since that time, he has participated remotely via Zoom in Court hearings.

[5] According to the bail report, Defendant "reported that he passed the bar exam, but he is not a member of the bar due to concerns for his moral character and fitness."

To address the Motion, the Court conducted three hearings, on August 18, September 4 and September 18, 2025. During the time the motion has been pending, the Court issued two interim modifications to the internet condition to facilitate Defendant's ability to communicate with his attorney:

- Defendant may communicate in private with his legal counsel by [Z]oom or other remote platform using a device that is under the control of (but not in the presence of) the Custodian. Text Order of Sept. 10, 2025.

- [T]he Court hereby modifies the ban on access to internet enabled devices and internet access to permit Defendant to access a single disclosed-in-advance to Pretrial Services internet enabled device, which Defendant is hereby permitted to use to communicate directly by email with his legal counsel in this case (including counsel[']s staff, investigators and experts). A list of such persons shall be provided by defense counsel to Pretrial Services in advance of Defendant[']s sending any emails to such person(s). Defendant[']s internet enabled device is subject to random access by Pretrial Services at any time in the discretion of the supervising officer to monitor compliance with this condition, provided that no content of any communication with any of the persons on the list provided by defense counsel to Pretrial Services may be reviewed. Defendant is not to delete or erase any activity on the identified device. Text Order of Sept. 18, 2025.

Further, the Court is now expanding Defendant's ability to use the pre-approved device to allow him to communicate directly with Pretrial Services, including with the supervising officer, without the involvement of the Custodian. Apart from these modifications, the Court denies the Motion for the reasons that follow, subject to Defendant's right to seek additional modifications to the internet condition based on a period of compliance sufficient to establish that the danger posed by Defendant's release has been mitigated (for example by medical treatment) or based on any other changed circumstance.

I.     **Background of Motion and Procedural Travel**

As grounds for the Motion, Defendant relies in part on his belief that there is little or no safety issue posed by the alleged conduct in that the charged crime is based solely on his having

sent a limited set of emails[6] that merely imposed "distress" on a narrow set of victims who can protect themselves by resetting their own devices to block Defendant's email address and by "complain[ing]" to the government if the conduct recurs. ECF No. 42 at 2, 5. Relatedly, Defendant relies on the absence of evidence that he ever carried out the threats of action in the emails so that the Court should find that the threats are "imagined" and "no one was endangered." Id. at 2. He also asks the Court to consider the absence of evidence of noncompliance since conditions were set despite his ability (as a sophisticated and intelligent individual) to circumvent them if he wished. Id. at 5. Legally, Defendant argues that the Court should grant his Motion because the internet condition imposes restrictions that violate his First, Fifth, and Sixth Amendment rights. ECF No. 54 at 1. Noting that the Court has imposed a no-contact order (Condition 7(g)), he contends that this is sufficient to protect from the insignificant danger posed to the small set of identified victims.

In connection with the Motion, the Court has received Defendant's original Motion (ECF No. 42) and Supplemental Memoranda (ECF Nos. 46, 53, 54), as well as the government's sealed response (ECF No. 45). In response to the Court's request (made during the first hearing) for a draft order partially lifting but not eliminating all internet restrictions, Defendant submitted the draft order (ECF Nos. 53, 53-1) that lists specific ways in which the internet could be accessed, e.g., to facilitate Defendant's participation in his defense, communication regarding medical treatment and for other purposes.[7] The Court is also in receipt of an unusual letter dated August

---

[6] During argument on the Motion, Defendant (through counsel) advised the Court that Defendant admits that he sent the emails in issue.

[7] Defendant objects to the draft order because he seeks the complete elimination of any internet restrictions. The government objects to the draft order because it contends that the current condition should be left intact.

27, 2025,[8] from the Court-appointed Custodian (a practicing attorney) purporting to present legal and factual arguments in connection with the Motion to Modify.  ECF No. 66.  Because Defendant is already represented by able counsel, the Court normally would exercise its discretion to refuse to consider such arguments from a collateral source.  See United States v. Lopez-Soto, 960 F.3d 1, 15 (1st Cir. 2020).  However, as described *infra*, in this unique instance, the Court has considered the letter in determining whether to lift the internet restrictions.

After the first hearing on the Motion, the Court focused on the draft order in considering whether to partially grant the Motion to afford limited internet access as it describes.  As part of that consideration, the Court looked at the four cases listed by Defendant, which he asserted are "pending matters" in which he is a litigant so he should be permitted internet access (including email and the use of PACER and CM/ECF) to make/receive filings and to communicate with court staff and opposing counsel.  ECF No. 53-1 ¶¶ 6, 8.  This review of the draft order led to the Court's *sua sponte* discovery that two of these cases have been closed for years and (apart from Defendant's recent filings) are not "pending matters,"[9] as well as that, after conditions were imposed in this case, there have been concerning filings in three of the listed cases.  The Court held the third hearing to consider these filings.

## II.   Standard of Review

For a bail hearing,[10] the Bail Reform Act contemplates a two-step analysis.  Step one, at 18 U.S.C. § 3142(b), provides for pretrial release on personal recognizance or unsecured

---

[8] Because this letter contains factual representations regarding a medical matter, the Clerk was directed to docket it under seal.  Notice of Instruction of Sept. 10, 2025.

[9] One of the listed matters is non-public so the Court is unable to ascertain whether it is really "pending" and whether Defendant has made filings in it since conditions were set.

[10] This legal analysis focuses exclusively on setting conditions to address danger, which is the basis for the internet condition.  Because other conditions not now in issue were set to address the risk of nonappearance, references in the cited sources to nonappearance have been intentionally omitted.  Further, because the Court denied the

5

appearance bond unless the court "determines that such release . . . will endanger the safety of any other person or the community." If the court determines there is no risk of danger from release – release must be ordered with no additional conditions. United States v. Mantecon-Zayas, 949 F.2d 548, 550 n. 3 (1st Cir. 1991) (per curiam). In considering dangerousness, the court should consider more than just physical harm. See United States v. Depa, Criminal Action No. 25-46-JWD-EWD, 2025 WL 1753584, at *3, *7-8 (M.D. La. June 25, 2025) (for purposes of Bail Reform Act, "danger" goes beyond direct and immediate physical harm and violence and is established by communications threatening physical harm to recipients of communications and their families, including references to names of children and hometowns or addresses). If the court determines there is risk of danger (as was found in this case), the court proceeds to the second step, at 18 U.S.C. § 3142(c). United States v. Patriarca, 948 F.2d 789, 791 (1st Cir. 1991).

Once a court has made the jump from § 3142(b) to § 3142(c) and decided to impose discretionary release conditions, it must consider the familiar factors laid out in 18 U.S.C. § 3142(g) and impose the conditions that are the least restrictive. United States v. Faria, Criminal No. 24-084 (GMM), 2024 WL 4706765, at *4 (D.P.R. Nov. 7, 2024). This analysis must amount to an individualized bail determination tailored to the facts pertaining to the defendant. Patriarca, 948 F.2d at 794 (bail decision must be made individually based on evidence regarding particular defendant). Similarly, in connection with a defendant's motion to modify conditions, the court performs a *de novo* review weighing the relevant factors. See United States v. Snead, Criminal No. 12-132M, 2024 WL 4473773, at *5 (D.R.I. Feb. 4, 2014) (on motion to modify release

---

government's request for detention, this analysis does not lay out the legal rubric for detention as applicable to this case.

conditions, court examines all facts presented by both parties). Thus, magistrate judges are empowered to "issue orders pursuant to section 3142 of title 18 concerning release or detention of persons pending trial" and may "at any time" amend the order to impose additional or different conditions of release. Snead, 2024 WL 4473773, at *5 (internal quotation marks omitted).

### III. Legal Principles Bearing on Internet Restrictions

As a matter of law, Defendant is correct that the Supreme Court has cautioned that courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks" on the internet, holding that a state law that completely barred the exercise of First Amendment rights on social networking sites "integral to the fabric of our modern society and culture" is facially invalid.[11] Packingham v. North Carolina, 582 U.S. 98, 105, 109 (2017). However, for purposes of this case, Packingham also specifies that:

> [T]his opinion should not be interpreted as barring a State from enacting more specific laws than the one at issue. Specific criminal acts are not protected speech even if speech is the means for their commission. Though the issue is not before the Court, it can be assumed that the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor. Specific laws of that type must be the State's first resort to ward off the serious harm that sexual crimes inflict.

Id. at 107 (emphasis added) (citations omitted). Thus, the law does not bar strict internet restrictions; rather, it permits internet restrictions that are factually supported as Packingham describes, including the banning of internet conduct that presages crime. Id.

Consistently, our Circuit teaches that

> broad restrictions on internet access as a condition of supervised release [may be imposed] where (1) the defendant used the internet in the underlying offense; (2)

---

[11] The Court rejects the government's argument that internet access is a privilege. See United States v. Negon-Cruz, __ F.4th __, 2025 WL 2476340, at *10 (1st Cir. Aug. 28, 2025) (First Amendment protects right to access internet).

> the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted.

United States v. Perazza-Mercado, 553 F.3d 65, 70 (1st Cir. 2009) (citing cases upholding significant post-conviction internet restrictions based on evidence that computer was used to commit offense, defendant had sophisticated computer skills, and defendant had a problem with self-control in using internet); but see United States v. Eaglin, 913 F.3d 88, 97 (2d Cir. 2019) (imposition of total internet ban for eleven-year period of supervised release is substantively unreasonable because it related neither to "the nature and circumstances" of crime of conviction nor to defendant's "history and characteristics" because internet had nothing to do with offense charged).  For example, in United States v. Bowker, No. 4:01CR441, 2010 WL 1539964, at *1-12 (N.D. Ohio Apr. 16, 2010), the court found: that the defendant had used the internet to harass the victim; that the defendant "no doubt" had used the internet to gather personal information about the victim; that the defendant filed a lawsuit against the victim; that, after a warning by law enforcement, the defendant persisted in sending harassing communications to the victim and to other persons (such as a neighbor and a co-worker) intended to reach the victim; and that the defendant was able to locate an address to send a Valentine's Day card to a former prosecutor who had been minimally involved in his conviction.  In such circumstances, the court noted the defendant's profession that he did not intend to commit physical violence but held that the total ban on internet usage (except as approved in advance by probation) was reasonable not only because this defendant had used the internet for some of the harassing communications, but also based on the inference that he had used it to locate public information to harass the victim, to harass others (such as the attorney involved in his prosecution) and to communicate with the victim indirectly through communication sent to others that might be expected to reach her.  Id.

8

at *12.  Bowker holds that the total internet ban would be left in place until the defendant had demonstrated compliance through his conduct.  Id.

In the pretrial release context, when the government establishes that the charged conduct was committed through the use of the internet, courts frequently address danger by imposing strict internet and internet-enabled device access conditions.  See, e.g., United States v. Lafrance, Criminal No. 16-10090-IT, 2016 WL 3882845, at *1-3 (D. Mass. July 13, 2016) (where defendant used email and internet to commit fraud on five victims, court denies motion to modify conditions of release banning any internet access and prohibiting possession of any internet enabled devices; court rejects arguments that defendant needs to use internet to communicate with counsel and that he had complied with conditions); United States v. Debrum, Criminal No. 15-10292-NMG, 2015 WL 6134359, at *5 (D. Mass. Oct. 19, 2015) ("safety of the community can be reasonably assured should the defendant be released according to the wide-ranging conditions enumerated . . . that, in particular, prohibit him from accessing the internet in any way (including by mobile internet or other kind of hotspot), using any device capable of accessing the internet, and leaving his residence where wireless internet service has been disconnected").

The seriousness of the danger arising from internet-based communications (despite the lack of physical violence) is further illustrated by cases in which even a complete internet ban was deemed inadequate, and detention was ordered.  For example, in United States v. Dai, 3:23-cr-478 (BKS/TWD), 2023 WL 11016392 (N.D.N.Y. Dec. 19, 2023), aff'd, 99 F.4th 136 (2d Cir. 2024), the court ordered detention in consideration, *inter alia*, of the risk that Defendant would post more threatening messages online if released and held that, "[t]he concern about safety is to be given a broader construction than the mere danger of physical violence.  Safety to the

community refers to the danger that the defendant might engage in criminal activity to the detriment of the community." Id. at *9 (internal quotation marks omitted). That is, it is the threats themselves that are harmful because they induce fear and terrorize people, affecting their safety, security and well-being. United States v. Capriotti, Case No. 21 CR 16, 2021 WL 229660, at *5 (N.D. Ill. Jan. 22, 2021) (decision to detain pretrial depended not on whether defendant had any intent to carry out his threats, but on risk of more threats, which were themselves harmful).

The Court is not persuaded by Defendant's reliance on United States v. Dodson, No. 22-3998, 2024 WL 712494, at *12 (6th Cir. Feb. 21, 2024), for the proposition that the Court's no-contact order (Condition 7(g)) is more than sufficient to address what Defendant contends is the minimal danger in this case. Dodson was a case where a post-conviction ban on all internet use for the period of supervised release was imposed to protect a single victim (a woman defendant had dated) from threatening communications. Id. at *1-4. In holding that the total ban on internet access and use was not reasonable and that a no-contact order would be sufficient, Dodson specifically noted that its holding would be different if the defendant had "threatened a government witness – or anyone besides [the woman]." Id. at *12. Thus, Dodson supports the proposition that a no-contact order is not sufficient in the circumstances presented in this case where the internet-based harassment and threats were not merely directed to a single domestic partner, but rather were directed against an array of government and other officials seemingly in retaliation for their performance of public/official functions. Further, compliance with a no-contact order requires the ability to exercise self-control; when a defendant's history and characteristics suggest issues with self-control in the use of the internet to commit crimes, significant internet restrictions are appropriate. Perazza-Mercado, 553 F.3d at 70.

Defendant suggests that, before setting intrusive internet conditions, the Court should consider that the victims can shoulder the burden of shielding themselves from his conduct. Thus, he contends that the victims could readily avoid what Defendant contends is the only danger – simple "distress"[12] – by not reading the emails that they might receive from Defendant. Defendant cites no cases to support this proposition, nor did the Court's research reveal any case holding that the burden of protecting victims from the danger posed by the pretrial release of a criminal defendant rests in the first instance on the victims themselves. The Court declines to adopt this approach. See generally Hotchkiss v. Cedar Rapids Community School District, 23-CV-CJW-MAR, 2023 WL 4684915, at *5 (N.D. Iowa July 21, 2023) ("the government has an overriding interesting in protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur" ) (cleaned up), aff'd, 115 F.4th 889 (8th Cir 2024).

## IV. Facts and Analysis Bearing on Internet Restrictions

### A. Pre-Condition Course of Conduct

In this case, the Court originally found that Defendant's release posed a risk of danger to other persons and to the community, based on which conditions were set to protect the victims, potential victims and the community from the conduct charged in the Criminal Complaint as described in the supporting Affidavit ("Affidavit"), and subsequently by the Indictment. The conduct in issue involved the drafting, through research that "no doubt" involved the use of the internet, Bowker, 2010 WL1539964 at *12, of more than ninety-five emails containing intimate and personal details regarding the residences, family members, religion, church affiliations and

---

[12] The Court also rejects this argument because the Indictment establishes probable cause supporting the charge that Defendant's "course of conduct" caused or would reasonably be expected to cause "substantial emotional distress" to each of the victims. See 18 U.S.C. § 2261A(2)(B).

intimate friends of public officials (principally federal judicial officers, but also attorneys serving in the Department of Justice and at an administrative agency, as well as the Dean of a law school). Sent by use of the internet, these deeply offensive, harassing, intimidating and terrifying emails were directed to victims A, B, C and D, and others, who apparently were chosen by Defendant as "people who were involved in [Defendant's] litigation claims and proceedings." ECF No. 42 at 3. Most of the victims appear to be public officials whose actions in performing official duties were perceived by Defendant to be adverse to him. For example, as to victim B, a federal judge, the Affidavit supporting the Criminal Complaint notes that Defendant sued victim B for conduct that has now all been held to be judicial acts protected by judicial immunity. Mullane v. Moreno, No. 21-13468, 2025 WL 1386666, at *7-8 (11th Cir. May 14, 2025). In addition to being foul, threatening and intimidating, parts of the emails quoted in the Affidavit are bizarre, referencing Ukraine, the Swiss ambassador and Swiss courts, the UAE ambassador, and the Bible (quoting "Eye for an eye" as justifying Defendant's threat to ruin the life of a close family member of victim B). Affidavit ¶¶ 12, 24, 28, 30, 36-37.

Based on the totality of the circumstances described in the charging documents, the Court infers that at least some of the research (which is relevant whether viewed as part of the "course of conduct" and or as conduct "presag[ing]" the criminal conduct, Packingham, 582 U.S. at 107) to acquire the personal details regarding the victims that was used in terrorizing and harassing them was done at least in part through the use of internet enabled devices and internet-based research.[13] Thus, the emails in issue named family members, friends and loved ones who resided

---

[13] In relying on this inference, the Court has also considered Defendant's oral admission on the record during the August 18, 2025, hearing that the research to find the deeply personal information that is weaponized in the emails quoted in the Affidavit was performed not by him but for him by his father (the Court-appointed Custodian) who located and provided him with copies of the victim judges' Financial Disclosure Statements. This admission is adverse to Defendant not only because it amounts to an admission permitting the inference that the research to write the emails was performed using the internet (albeit by another on his behalf), but also because this statement is

12

with victims and threatened, for example, that Defendant would appear at the victims' homes. One email told a victim (a judicial officer), "I'm going to ruin your precious [close relative's] life as badly as you did to me" while another urged a victim to use a ".357 Magnum" to kill himself. Using the internet, these emails were harassingly sent day and night, sometimes one after another. The Court finds that the content of the emails "would be reasonably expected to cause," 18 U.S.C. § 2261A(2)(B), the victims to believe that they were being taunted because they are helpless and there was nothing (short of incarcerating Defendant) they can do to protect themselves and their families and friends from whatever actions Defendant might choose to take. The Court further finds that the emails caused substantial emotional distress based on the government's proffer that one victim was so terrified that he/she slept with a weapon under the pillow while another hired private security for protection, as well as that one victim's terror was exacerbated because an incapacitated family member was in the residence that Defendant threatened to invade. In addition, the Court finds that the threat that Defendant would travel to and appear at victims' homes is far from empty in that the bail report establishes that Defendant has traveled all over the world and within the United States and would be well able to carry out such a threat.

Proving that a far more significant restraint than a simple no-contact order is needed to protect from the danger posed by the alleged conduct is an incident described in the Affidavit supporting the Criminal Complaint. When law enforcement tried to use non-coercive methods to deter the course of conduct by a visit from local police and a Deputy U.S. Marshal to Defendant's home, he retreated to his bedroom to send foul and threatening emails to victims A

---

misleading in that the intimate personal information in the emails in issue is not contained in Financial Disclosure Statements.

13

and B telling them that law enforcement was in his home at that moment, threatening to sue them again and taunting them that the law enforcement warning "signals that I have successfully hit a nerve," and that it will not protect them from his conduct ("[i]f you want to scare me, its [sic] not working, I'm sorry to say"). Affidavit ¶¶ 24-25. This evidence of lack of self-control in using the internet supports the imposition of strict internet restrictions. Perazza-Mercado, 553 F.3d at 70.

Thus, based on the charging documents, Defendant's admission that he sent the emails, the inference that Defendant (acting directly or indirectly) performed research regarding the victims to prepare emails that would harass and intimidate, and the government's proffer regarding the terrifying impact of the emails on victims, the Court finds that the strength of the evidence supporting the charges is of considerable weight and that the government has amply sustained its burden of clearly and convincingly establishing substantial and very real (not "imagined") danger caused by Defendant's course of conduct in using and accessing the internet to harass and intimidate, including by researching, drafting and sending harassing and terrorizing emails, to the victims, to other public officials, and to the community, which is endangered when public officials cannot be protected from the conduct of persons seeking to deter them from appropriately performing their duties. See Capriotti, 2021 WL 229660, at *5. Therefore, the Court finds that the significant internet restrictions originally set by the Court (as now modified) are warranted to address the danger posed by Defendant's release. That leaves only the question whether circumstances have changed sufficiently since conditions were set so that such strict internet conditions are no longer necessary.

**B.     Post-Condition Conduct and the Custodian**

The evidence of post-condition conduct as reflected in three of the four cases that Defendant had listed in the draft order is summarized below.[14]

First, Defendant's draft order represented that he needed to be able to access the internet (including PACER, CM/ECF and email to communicate with court staff and opposing counsel) in a "pending matter[]" captioned Mullane v. Breaking Media, Inc., 18-cv-12618 (D. Mass.). ECF No. 53-1 at 2.  Until June 23, 2025, victim A was the presiding judicial officer for this case; victims B and C are terminated parties in this case.  The Court's examination of the docket revealed that this case has been closed since January 6, 2020, and that Defendant (and his father, the Custodian, who unsuccessfully tried to become a party by intervention) lost on appeal on February 26, 2021.  However, one week after conditions were imposed, on May 13, 2025, the docket reflects that the Custodian filed a "Joint Motion" as if he were a party, for himself and Defendant, illogically asking the Chief Justice of the United States to assign this closed case to a district judge in another Circuit.  As far as the docket reflects, this "Joint Motion" was not addressed by the court; victim A remained the assigned judge.  Then on June 11, 2025, Defendant himself made a far more troubling filing by mail, which he signed and sent to the clerk for filing.  It is a single hand-written page – in red ink – and purports to be a "supplemental authority," consisting of a Bible quotation regarding "daughter of Israel" and "[r]eopen[ing] the

---

[14] The Court emphasizes that this consideration of post-condition conduct is not in derogation of Defendant's right to access the courts by filing lawsuits and by making filings by mail or through CM/ECF by the Custodian on Defendant's behalf that are not for the purpose of harassment or intimidation.  See Sullivan v. Sullivan, No. S-14164, 2012 WL 4039812, at *2 (Alaska Sept. 12, 2012) (applying Alaska law, no violation of protective order to file lawsuit not intended to intimidate or harass); C.W.W. v. State, 688 N.E.2d 224, 226 (Ind. Ct. App. 1997) (applying Indiana law, purpose of no-contact order was to prevent harassment; court cannot conclude complaint was filed to harass "absent a determination that [the] lawsuit is frivolous, unreasonable or groundless"); but see People v. Jones, No. 261414, 2006 WL 572402, at *1 (Mich. Ct. App. Mar. 9, 2006) (per curiam) (applying Michigan law, court finds act of filing suit along with other conduct violated no-contact condition of probation without discussion of viability of complaint).  For example, within the narrow scope of the remand, Mullane v. Moreno, 2025 WL 1386666, at *9, Defendant is free to make filings (as long as not for the purpose of harassment or intimidation) in the pending matter in the Southern District of Florida, Mullane v. Moreno, 20-cv-21339 (S.D. Fla).  However, although the mandate issued on August 5, 2025, as far as the Court can discern, Defendant has made no such filings.

inquiry." The Court notes that this Bible quote echoes the use of a Bible quotation and references to religion (e.g., "your dear Jewish friend") that appear in the emails in issue. See e.g, Affidavit ¶ 13. Victim A filed a recusal order two weeks later, on June 23, 2025. The red-ink hand-written filing also indicates that a copy was sent to "counsel of record"; the Court cannot ascertain whether this means that it was sent to counsel for victim B and victim C (and therefore might be reasonably expected to reach them). During the third hearing, Defendant argued that his intent was simply to provide support for reopening the case (which relief had not been requested, although it was adverted to in the "Joint Motion" filed by the Custodian). Defendant further argued that he was not intending to breach the Court's no-contact condition through indirect contact with victim A because he assumed that the case had already been reassigned although the docket is clear that it had not been.

Second, Defendant's draft order represented that he needed to be able to access the internet (including PACER, CM/ECF and email to communicate with court staff and opposing counsel) in a "pending matter[]" captioned Mullane v. Barclay's Bank Delaware, 18-cv-20596 (S.D. Fla.). The Court's examination of the docket reveals that this case has been closed since April 19, 2018. The Court further notes that this case was originally assigned to victim B, who recused himself on April 13, 2018. Mullane v. Moreno, 2025 WL 1386666, at *2. Since then, the docket reflects repeated filings by Defendant almost all of which were denied culminating in the court's 2024 ruling that Defendant did not "offer any non-frivolous grounds for reopening this matter." Text Order of August 9, 2024. Then, after this Court issued conditions, on May 28, 2025, Defendant filed (by mail) a motion for reassignment similar to the "Joint Motion" filed two weeks earlier in the District of Massachusetts Breaking Media, Inc. case; the court rejected this motion as frivolous. And then, on June 16, 2025, Defendant filed "supplemental authorities"

16

– a hand-written letter to the clerk for filing dated June 9, 2025, (the same date as the red-ink Biblical quote filed in victim A's case) with a long list of Biblical citations to the Book of Proverbs.[15]  The Court notes that the bizarre filing in this case appears to be directed to the judicial officials who assumed responsibility for the case after victim B's recusal, permitting the inference that the danger of exposure to Defendant's conduct extends beyond the named victims.  ECF No. 42 at 3.

Third, Defendant's draft order represented that he needs to be able to access the internet (including PACER, CM/ECF and to email court staff and opposing counsel) in what is still a "pending matter[]" – Mullane v. Moreno, Case No. 20-cv-21339 (S.D. Fla), on appeal, Mullane v. Moreno, No. 21-13468 (11th Cir.).  In this case, Defendant sued victim B and victim C among others; in 2021, the district court held that all of the named defendants' actions were within the scope of their federal employment, substituted the United States as the party defendant for the state-law tort claims asserted against non-judicial defendants (including victim C) and dismissed the remaining claims, including because victim B was entitled to absolute judicial immunity.  After voluntarily dismissing claims against the United States, Defendant filed a largely unsuccessful appeal.  Mullane v. Moreno, Case No. 1:20-cv-21339-AKK, 2021 WL 2661175 (S.D. Fla. June 29, 2021), aff'd in part, rev'd in part and remanded, No. 21-13468, 2025 WL 1386666, at *9 (11th Cir. May 14, 2025) (affirming except for a limited remand regarding victim C), reh'g en banc denied (11th Cir. July 28, 2025).  After conditions in this case were set, and while Defendant's petition for panel rehearing (or in the alternative for rehearing en banc) of the Eleventh Circuit's decision was pending, Defendant's father docketed on Defendant's behalf two

---

[15] The Court has not examined all of these Biblical citations, noting only that the first listed citation is to Proverbs 1: 31-33, which ominously threatens that those who "turn[] away" will be "slay[ed]" and "destroy[ed]."  Proverbs 1: 31-33 (King James).

17

typed filings (the first on June 25, 2025, and the second on July10, 2025) signed by Defendant that can only be described as bizarre. Purporting to be a filing of "supplemental authorities," they are a list of citations with quotations largely to matters of international law, including such quotations as "offenders are 'common enemies of all mankind,'" and referencing Swiss law (echoing the emails). Mullane, No. 21-13468, ECF Nos. 69, 70. The Court does not know whether these filings reached victim B or victim C, although the Court notes that in one of the charged emails, Defendant taunted victim B: "[w]hy didn't you come to oral argument before the Eleventh Circuit . . . I was looking forward to seeing you again." Affidavit ¶ 34.

In considering the significance of this post-condition conduct,[16] the Court has taken into account Defendant's intelligence and legal sophistication, which the Court finds permits him to distinguish between an effective legal argument appropriately asserted in a case and the use of his legal training and filing privileges (by mail or in reliance on the Custodian) to continue the pattern of intimidation and harassment with sinister filings thinly veiled as "supplemental authorities." These filings are not only patently irrelevant but also could reasonably be expected to reach the victims and potential victims; thus, they are perilously close to intentional violations of the ban on indirect communication with any victim. The Court finds that the post-condition conduct undermines Defendant's contention that the internet restriction is no longer necessary because no patently harassing emails have been sent since his arrest. In considering the implication of the post-condition conduct, the Court has also considered the allegation in the Affidavit (¶ 24) that the emails in issue included Defendant's threats that he would sue victim A and victim B "yet again," permitting the inference of the intent to use his legal training to

---

[16] The Court has not found – one way or the other – that this conduct amounts to a violation of bail conditions. Neither the government nor Pretrial Services has asked me to make such a finding. Nevertheless, the Court has considered these post-condition facts as recited in the text, including Defendant's explanation at the third hearing following a continuance to allow him time to investigate and explain the conduct.

perpetuate the pattern of harassment and intimidation. In sum, the post-condition conduct establishes that it is premature to roll back the internet restrictions, beyond the modifications already issued and issuing today.

Finally, the Court has considered that the Custodian's letter and some of the post-condition conduct undermines the Court's trust in the Custodian's commitment to his undertaking to supervise Defendant and to alert the Court to any deviation from compliance with conditions. Thus, in the letter, the Custodian argued to the Court that the conduct in issue was precipitated by a "toxic prescription drug cocktail" that Defendant had been taking as mental health treatment but that, since the criminal case began, Defendant's treatment has changed, resulting in "palpable progress . . . over these past months" (a "positive holistic recovery") so that the conduct will not recur and conditions should be reduced. ECF No. 66. Yet, the Custodian, despite his experience as a practicing attorney, also facilitated Defendant's bizarre filings in the Eleventh Circuit in June and July, one and two months respectively after the "recovery" that the Custodian claimed in the letter to the Court. The Custodian's letter is also very concerning in that it reveals that the Custodian (who accepted the responsibility of supervising Defendant and notifying the Court of any violations of conditions) believes that several of the Court's conditions are unnecessary. The Court finds that the letter amounts to some evidence that the appointment of the Custodian has been less effective as a condition, requiring the Court to maintain other conditions (such as the internet restrictions) to address the danger established by the government.

## V. **Conclusion**

Balancing all of these considerations, apart from the modifications already issued (which remain in full force and effect), and the modification expanding Defendant's use of the internet

to allow him to communicate directly with Pretrial Services, including the supervising officer, using the pre-approved device as the supervising officer shall direct (which modification is hereby issued), the Court DENIES Defendant's Motion to Modify (ECF No. 42) without prejudice to his seeking further modification of the internet restrictions after a period of compliance or any other changed circumstance.

So Ordered.

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
September 29, 2025, unsealed version issued October 22, 2025